# Illinois Official Reports

## Appellate Court

*People v. Johnson*, **2014 IL App (1st ) 120701**

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. TRAVELL JOHNSON, Defendant-Appellant. |
| District & No. | First District, Third Division<br>Docket No. 1-12-0701 |
| Filed | November 5, 2014 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Based on the one-act, one-crime doctrine, the appellate court vacated the defendant's convictions for crimes other than the attempted first degree murder of the two people who were fired at during an incident in which defendant was involved with others in beating the first victim and then firing at an off-duty police officer who came upon the scene and attempted to restore order, and the convictions for attempted first degree murder were allowed to stand; furthermore, the mittimus erroneously listing the conviction imposed by the trial judge for firing at the police officer as a conviction for aggravated discharge of a firearm in the direction of a peace officer was corrected to reflect a conviction for attempted first degree murder. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 08-CR-9367; the Hon. Evelyn B. Clay, Judge, presiding. |
| Judgment | Affirmed in part and vacated in part; mittimus corrected. |

Counsel on Appeal      Michael J. Pelletier and Autumn Renee Fincher, both of State Appellate Defender's Office, of Chicago, for appellant.

Anita M. Alvarez, State's Attorney, of Chicago (Mary P. Needham and Brooke N. Shupe, Assistant State's Attorneys, of counsel), for the People.

Panel      JUSTICE HYMAN delivered the judgment of the court, with opinion. Presiding Justice Pucinski and Justice Mason concurred in the judgment and opinion.

**OPINION**

¶ 1      After a bench trial, the trial court convicted defendant Travell Johnson of two counts of attempted first degree murder, one count of aggravated discharge of a firearm, and one count of aggravated battery with a firearm, and sentenced him to concurrent, respective terms of 21, 21, 4, and 6 years' imprisonment. On appeal, Johnson challenges the sufficiency of the evidence to hold him accountable for the attempted first degree murder of Gary Riley and for aggravated discharge of a firearm. He further contends that his mittimus should be corrected to accurately reflect the offenses of which he was convicted and that all but his two convictions for attempted first degree murder must be vacated under the one-act, one-crime doctrine.

¶ 2      We affirm Johnson's convictions–the State proved his guilt beyond a reasonable doubt on the basis of accountability under the common design rule. But, we vacate under the one-act, one-crime doctrine his convictions for aggravated discharge of a firearm and aggravated battery with a firearm and correct the mittimus to reflect two convictions for attempted first degree murder.

¶ 3                                     Background

¶ 4      Johnson and codefendant Timothy Petermon, who is not a party to this appeal, were charged in relation to a shooting in an alley on the south side of Chicago that occurred on March 29, 2008. During this incident, off-duty police officer Gary Riley saw Johnson, Petermon and another man beating Kelvin Jemison. After Officer Riley saw Petermon shoot Jemison, he attempted to stop the attack, but Petermon began to shoot at the officer, who then returned fire. Following an investigation, Johnson and Petermon were identified as the perpetrators and arrested. Johnson was charged with attempted first degree murder of a peace officer, attempted first degree murder of Jemison, aggravated discharge of a firearm, and aggravated battery with a firearm. (Johnson and Petermon were tried jointly. Petermon filed a separate appeal, and, on September 10, 2014, this court affirmed Petermon's convictions and corrected his mittimus to reflect the vacation of his convictions for aggravated discharge of a firearm and aggravated battery. *People v. Petermon*, 2014 IL App (1st) 113536.)

¶ 5      At trial, Officer Riley testified that at about 2 p.m. on March 29, 2008, while on his way to work, he stopped to pick up his dry cleaning at a store on 47th Street near Michigan Avenue.

He was wearing plain clothes and driving a black truck. As he got out of his truck, he saw three men in a nearby alley fighting with a man, Kelvin Jemison, who was on the ground. One of the three men was "overlooking," while the other two were "swinging on" Jemison. Officer Riley then saw one of those two men pistol-whip Jemison and then shoot him, after which Officer Riley announced his office, shouted "stop," and drew his service weapon. The man holding the gun then turned and began shooting in Officer Riley's direction. Officer Riley took cover behind his truck and returned fire two or three times. The three men got in a car and drove away. Officer Riley called 911 and spoke with responding officers on the scene.

¶ 6        Officer Riley further testified that on April 10, 2008, he viewed a lineup at the police station and identified Johnson as one of the men he saw beating Jemison. The next day, he viewed another lineup and identified Petermon as the man who shot Jemison and fired in his direction. Officer Riley also made in-court identifications of Johnson and Petermon as the perpetrators. On cross-examination, Riley said that when he first noticed the three men, Petermon already had the gun out. He never saw anyone hand the gun to Petermon or heard anyone tell Petermon to shoot. But, he acknowledged, when he spoke with the Independent Police Review Authority on the day of the incident, he told them that as he watched the three men batter Jemison, one of them suddenly produced a handgun.

¶ 7        Benjamin Smith testified for the State and acknowledged prior convictions. Smith testified that as he left a restaurant near 47th Street and Michigan Avenue he saw three men in an alley about 10 feet away beating up another man. Smith recognized one of the perpetrators as "Pumpkin's son," and Smith made an in-court identification of Johnson as that man, and of Petermon as one of the other perpetrators. He further testified that initially the perpetrators were "fist fighting" Jemison, who was trying to get away, but Smith then saw Johnson pull a gun from his jacket pocket, hand it to Petermon, and tell Petermon to "shoot the motherfucker." Smith saw Petermon shoot Jemison several times. An off-duty police officer standing nearby identified himself at that time and Smith saw Petermon fire twice at the officer, and the officer fire back at Petermon. The three perpetrators got into a car and drove off.

¶ 8        On cross-examination, Smith testified that Johnson may have said "shoot the son of a bitch" instead of "shoot the motherfucker," and denied telling police that Johnson removed a gun from his coat and fired shots and that he was not sure who fired the shots. Smith acknowledged that during his grand jury testimony on April 24, 2008, he may have stated that he was standing 5 feet away from the altercation, instead of 10 feet away.

¶ 9        Kelvin Jemison testified for the State. At the time of his testimony, Jemison was in custody due to pleading guilty to unlawful use of a weapon by a felon in an unrelated case and he stated that he was not offered the plea deal in exchange for his testimony in this case. Jemison acknowledged pleading guilty to delivery of a controlled substance in 2006 and in 2005, and to a 2002 conviction for possession of a stolen motor vehicle.

¶ 10       Jemison testified that he was near the area of 116 East 47th Street walking to a store with a friend when he entered into an altercation with three or four men and was shot numerous times. Jemison's testimony regarding who shot him was inconsistent. Initially, Jemison testified that he did not know who shot him, and he said that the police officers who talked to him at the hospital "came at him with some names." He also said the officers told him "it can go two ways," implying they were coercing him to identify Petermon as the shooter. Later, Jemison testified that on the day of the shooting, police officers came to the hospital and showed him a

photo array and he identified Johnson as one of the men he was fighting with and Petermon as the man who shot him. He also told the officers he heard Johnson say "we ain't got time for this shit, pop his ass." In court, Jemison identified Petermon as the shooter.

¶ 11 On April 10, 2008, Jemison told detectives that he got into an argument with Johnson over whether Jemison was permitted to walk on 47th Street, which led to the fight and Petermon shooting him. Jemison testified that on October 19, 2009, he went to the public defender's office and signed a statement recanting his earlier statements to the police. The reason he did so was because he did not want to testify; however, his recantation statement was a lie.

¶ 12 On cross-examination, Jemison testified that he did not see a gun in Johnson's hand and did not see anyone hand a gun to the person who shot him. He said that he had known Johnson for seven or eight years and knew the sound of Johnson's voice, but he did not hear Johnson say "pop his ass," or anything similar. On redirect examination, Jemison testified that before he was shot, he heard someone say, "we don't need this shit, pop his ass."

¶ 13 Chicago police detective Samuel Brown testified that when he interviewed Jemison at the hospital on the day of the incident, Jemison told him that three people, including Johnson, were involved and that the shooter went by the name "T," "Timo," or "Tom-Tom." Later that day, he presented two photo arrays to Jemison, who then identified Johnson as the person who told the shooter "we ain't got time for this shit, pop his ass." Chicago police detective Timothy Cerven testified that he spoke with Jemison on April 10, 2008, at the Cook County jail. At that time, Jemison told him that Johnson said "pop his ass" before Jemison was shot.

¶ 14 The parties stipulated to the expert testimony of forensic scientist Kurt Murray, who would testify that a fired bullet and four fired cartridge cases recovered at the scene were fired from Officer Riley's gun, and that six fired cartridge cases, a fired bullet, and three fired bullet jacket fragments which were also recovered at the scene were not fired from Officer Riley's gun. The State then rested, following which Johnson rested.

¶ 15 During Petermon's case in chief, the parties entered into several stipulations, including, relevant here, that if called, Chicago police detective Padilla would testify that he spoke with Smith on arriving at the scene and Smith told Padilla that he saw Pumpkin's son remove a gun from his pocket and fire at least twice. Smith later identified Johnson as Pumpkin's son and told Detective Padilla that he thought Johnson fired the shots but was not certain. On April 11, 2008, Smith made a written statement, which included his assertion that when he told officers that Johnson was the one who had the gun, he meant that Johnson had it first but was not the person who shot Jemison or shot at the police officer. Johnson's counsel joined in these stipulations as well. Petermon then rested.

¶ 16 Following closing arguments, the trial court found that the evidence of Johnson and Petermon's guilt was "overwhelming." The court found Johnson guilty of the attempted first degree murder of Gary Riley, a peace officer; the attempted first degree murder of Kelvin Jemison; aggravated discharge of a firearm; and aggravated battery. In doing so, the trial court found that although testifying witnesses described what Johnson said in various ways, the substance was "pop him," and that Johnson was seen handing the gun to Petermon.

¶ 17 Johnson filed a posttrial motion, and, after a hearing, the trial court reduced the attempted first degree murder of a peace officer conviction to attempted first degree murder, finding that the evidence was insufficient to show that Johnson knew or should have known that Officer Riley was a police officer. The trial court sentenced Johnson to 21 years' imprisonment for the attempted first degree murder of Officer Riley; 21 years' imprisonment for the attempted first

- 4 -

degree murder of Kelvin Jemison; 4 years' imprisonment for aggravated discharge of a firearm; and 6 years' imprisonment for aggravated battery with a firearm.

¶ 18                                    Analysis
¶ 19                            Sufficiency of Evidence
¶ 20        On appeal, Johnson first contends that the evidence was insufficient to sustain his convictions for the attempted first degree murder of Officer Riley and for aggravated discharge of a firearm. Specifically, Johnson contends that the evidence presented failed to show beyond a reasonable doubt that he intended to assist Petermon in shooting at Officer Riley or that Petermon's act of shooting at the officer was an act committed in furtherance of a common criminal scheme, and thus failed to establish his guilt based on a theory of accountability.

¶ 21        The standard of review on a challenge to the sufficiency of the evidence involves, first, viewing the evidence in the light most favorable to the prosecution, and then determining whether any rational fact finder could find the essential elements of the offense beyond a reasonable doubt. *People v. Siguenza-Brito*, 235 Ill. 2d 213, 224 (2009). This standard applies to all criminal cases, whether the evidence is direct or circumstantial, and acknowledges the responsibility of the fact finder to assess the credibility of the witnesses, to weigh the evidence and draw reasonable inferences from it, and to resolve any conflicts in the evidence. *People v. Campbell*, 146 Ill. 2d 363, 374-75 (1992). A reviewing court will not reverse a conviction unless the evidence is so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt of defendant's guilt. *People v. Jackson*, 232 Ill. 2d 246, 281 (2009).

¶ 22        Under Illinois law, to be legally accountable for the conduct of another, either before or during the commission of the offense, a person with the intent to promote or facilitate the commission of the offense must aid, abet, or attempt to aid another in planning or committing the offense. 720 ILCS 5/5-2(c) (West 2008). This does not require active participation. *People v. Taylor*, 164 Ill. 2d 131, 140-41 (1995). To prove defendant had the requisite intent, the State has to show either defendant shared the criminal intent of the principal or the existence of a common criminal design. *In re W.C.*, 167 Ill. 2d 307, 337 (1995). Words of agreement are not necessary to establish a common purpose to commit a crime, but rather, the common design may be inferred from the circumstances surrounding the perpetration of the unlawful conduct. *Taylor*, 164 Ill. 2d at 141. Under the common design rule, where two or more persons engage in a common criminal design or agreement, any acts in furtherance committed by one party are considered to be the acts of all parties to the common design and all are equally responsible for the consequences. *In re W.C.*, 167 Ill. 2d at 337.

¶ 23        This case is one of common design, and we find *People v. Fernandez*, 2014 IL 115527, most instructive. In *Fernandez*, a codefendant asked defendant to drive him to a parking lot so that he could break into cars. *Fernandez*, 2014 IL 115527, ¶ 8. Defendant complied and waited in the car while the codefendant broke the window of a parked car and tried to steal the radio. *Id.* An off-duty police officer happened on the scene, announced his office and attempted to intervene, at which point the codefendant made his way back to the car and fired several shots at the officer before defendant drove them away. *Id.* ¶¶ 3, 8. The trial court convicted defendant by accountability of burglary and aggravated discharge of a firearm in the direction of a peace officer, and this court affirmed those convictions. *Id.* ¶¶ 1, 10. On appeal to the supreme court, defendant did not contest his conviction for burglary, and conceded that he aided in the planning and commission of that offense, but argued that he could not be held

accountable for his codefendant's act of firing at the officer because the State failed to show that he knew his codefendant was armed and, in turn, failed to show that defendant intended to aid in the act of firing at the officer. *Id.* ¶¶ 12, 18.

¶ 24 The supreme court rejected defendant's contention, holding that by conceding his guilt for the burglary, which was a common criminal design, he effectively conceded his guilt for aggravated discharge of a firearm. *Id.* ¶ 18. In doing so, the court reasoned that the codefendant's act of firing at the officer who happened on the scene and unexpectedly interrupted him was an act done in furtherance of the codefendants' common criminal design or agreement to commit a burglary. *Id.* ¶¶ 13-18. No evidence showed defendant was aware that his codefendant was armed or, of course, that an off-duty officer would happen on the scene, yet, this did not prevent the court from reaching its conclusion. See *id.* ¶¶ 17-19.

¶ 25 Johnson does not contest that he was at the scene with Petermon. Nor does he contest that they both battered Jemison. As in *Fernandez*, Johnson, in conceding that he and Petermon jointly beat Jemison, acknowledged his involvement in a common criminal design with Petermon for that purpose and effectively conceded his guilt for the attempted first degree murder of Jemison. (We note that defendant is not contesting his conviction for the attempted first degree murder of Jemison. *Supra* ¶ 20.) Whether Johnson handed a gun to Petermon or instructed Petermon to shoot Jemison, or was even aware that Petermon had a gun, has no bearing on his legal accountability for Petermon's act of shooting Jemison, or for any other act Petermon did in furtherance of their common design, including his act of shooting at Officer Riley. *Supra* ¶¶ 20-22.

¶ 26 Nevertheless, Johnson maintains that even assuming arguendo that a common criminal design existed between him and Petermon, it was limited to Jemison, and Petermon's act of shooting at Officer Riley was not committed in furtherance of that common agreement. He contends that he cannot be held legally accountable for Petermon's spontaneous act when neither he nor Petermon anticipated Officer Riley's presence at the scene and interference in the attack and he had no advance knowledge of Petermon's act of shooting at Officer Riley.

¶ 27 Again the *Fernandez* case applies. As in *Fernandez*, Johnson and Petermon engaged in a common criminal design at the time an off-duty police officer happened on the scene of a crime in progress and attempted to intervene. Also, as in *Fernandez*, codefendant Petermon shot at the officer before fleeing with Johnson. The fact that the officer's appearance and intervention at the scene was unexpected does not mean that Petermon's act of shooting at the officer was unrelated to furthering their previously agreed-on common criminal design. We thus find that, in viewing the evidence presented in the light most favorable to the prosecution (*Siguenza-Brito*, 235 Ill. 2d at 224), the State proved beyond a reasonable doubt Johnson's guilt on the claims of accountability of the attempted murder of Riley and on aggravated discharge of a firearm. *Fernandez*, 2014 IL 115527, ¶¶ 17-18.

¶ 28 In reaching this conclusion, we have considered Johnson's contention that the only evidence that he handed a gun to Petermon and instructed him to shoot Jemison comes from Smith's testimony and that Smith's testimony should be discounted. In so arguing he points out that Smith described Johnson's words of instruction at different times in various ways, that Smith told investigating officers on the scene that Johnson fired the gun, and that Officer Riley testified that he did not see anyone hand a gun to Petermon or instruct him to shoot. But as we have explained, whether Johnson provided, or even had knowledge of, the gun is irrelevant to his accountability for the offenses based on Petermon's acts of shooting at Jemison and Riley,

which were done in furtherance of their common design. *Id.* ¶¶ 17-19. Further, it was for the trier of fact to resolve any conflicts or inconsistencies in the evidence, and we have no basis to substitute our judgment for the trial court's. *Campbell*, 146 Ill. 2d at 374-75, 389.

¶ 29                                    One-Act, One-Crime Doctrine

¶ 30     Johnson's final two contentions are interrelated, so we will address them together. Johnson contends, and the State concedes, that the one-act, one-crime doctrine requires we vacate all of his convictions other than for the attempted first degree murders of Riley (count II) and Jemison (count V). Under the one-act, one-crime doctrine, a defendant may be convicted of only one crime resulting from a single act, and, accordingly, where two convictions arise from the same physical act, sentence should be imposed on the more serious offense and the less serious offense should be vacated. *People v. Artis*, 232 Ill. 2d 156, 170 (2009). As such, Johnson's most serious offense as to each victim–the attempted first degree murder of Officer Riley (count II) and the attempted first degree murder of Jemison (count V)–will be permitted to stand, and Johnson's remaining convictions of aggravated discharge of a firearm (count VIII) and aggravated battery with a firearm (count XI) will be vacated.

¶ 31     That said, Johnson points out, and the State concedes, that the mittimus erroneously lists one of his attempted first degree murder convictions (count V) as a conviction for aggravated discharge of a firearm in the direction of a peace officer, and thus should be corrected to accurately reflect the offense of which he was convicted. Where the sentence reflected in the mittimus conflicts with the sentence imposed by the trial judge, as set out by the report of proceedings, the report of proceedings controls. *People v. Peeples*, 155 Ill. 2d 422, 496 (1993). Under Illinois Supreme Court Rule 615(b)(1) (eff. Jan. 1, 1967), we may order the circuit court clerk to make the necessary corrections without remand. *People v. Magee*, 374 Ill. App. 3d 1024, 1035 (2007).

¶ 32                                            Conclusion

¶ 33     We vacate Johnson's convictions for aggravated discharge of a firearm (count VIII) and aggravated battery with a firearm (count XI) and direct the clerk of the circuit court of Cook County to correct the mittimus to reflect that Johnson was convicted of two counts of attempted first degree murder (counts II and V), both of which carry sentences of 21 years' imprisonment, with the sentences to be served concurrently. The judgment of the circuit court of Cook County is affirmed in all other respects.

¶ 34     Affirmed in part and vacated in part; mittimus corrected.